# THE CHEROKEE TRUST FUNDS.

## EASTERN BAND OF CHEROKEE INDIANS *v.* UNITED STATES AND CHEROKEE NATION, COMMONLY CALLED CHEROKEE NATION WEST.

APPEAL FROM THE COURT OF CLAIMS.

Argued January 4, 5, 6, 1886.—Decided March 1, 1886.

By treaties with the Cherokees the United States have recognized them as a distinct political community, so far independent as to justify and require negotiations with them in that character.

The Cherokees in North Carolina dissolved their connection with the Cherokee Nation when they refused to accompany the body of it on its removal, and have had no separate political organization since; though fostered and encouraged, they have not been recognized by the United States as a nation,

in whole or in part, and, as now organized, are not the successor of any organization recognized by any treaty or law of the United States.

The claim of the Cherokees of North Carolina to a share of the commuted annuity fund of $214,000, and of the fund created by sales of lands west of the Mississippi ceded to the Cherokee Nation, has no substantial foundation ; those funds and that property being dedicated by the Constitution of the Cherokees, and intended by their treaties with the United States for the benefit of the united nation, and not in any respect for those who had separated from it and become aliens to their nation.

This action was commenced by appellants in the Court of Claims under the jurisdiction conferred upon that court by the following provision in the act of March 3, 1883, ch. 141, 22 Stat. 582, 585 : " That the Eastern Band of Cherokee Indians is hereby authorized to institute a suit in the Court of Claims against the United States to determine the rights of the said band in and to the moneys, stock, and bonds held by the United States in trust for the Cherokee Indians, arising out of the sales of lands lying west of the Mississippi River, and also in a certain other fund, commonly called the permanent annuity fund, to which suit the Cherokee Nation, commonly called the Cherokee Nation West, shall be made a party defendant. The said Eastern Band shall within three months after the passage of this act file a petition in said court, verified by the principal chief of said band, setting forth the facts upon which said claim is based. The said Cherokee Nation West shall within six months after the passage of this act file its answer to said petition, and said cause shall proceed to final determination pursuant to the practice in said court, and such rules or orders as the said court may make in that behalf.

" The Secretary of the Interior shall transmit to said court for the consideration of said court copies duly certified of all records, reports, papers, and other documents on file in the Department of the Interior which he may deem necessary to said cause, or which may be requested by either of the parties hereinbefore referred to, and the said parties, respectively, may take and submit to said court such additional competent testimony as they may desire. And jurisdiction is hereby conferred upon said court to hear and determine what, if any, interest, legal or equitable, the said Eastern Band has in said

moneys, stocks, bonds, so held in trust as aforesaid by the United States, and shall enter a decree specifically defining the rights and interests of the said Eastern Band therein, and in any moneys hereafter to be derived from sources similar to those out of which the existing fund arose.

"When the interest, if any, of the said Eastern Band has been ascertained as aforesaid, the Secretary of the Treasury shall, out of the portion of said fund adjudged to said parties, respectively, pay all the proper costs and expenses of said respective parties of the proceedings herein provided for, each party, except the United States, to be liable for its own costs and expenses, and the remainder shall be placed to credit of the said Eastern Band and of the Cherokee Nation, in accordance with their respective rights as ascertained by the said judgment and decree of said court.

"In the said proceeding the Attorney General, or such of his assistants as he may designate, shall appear on behalf of the United States. Either of the parties to said cause may appeal from any judgment rendered by said Court of Claims to the Supreme Court of the United States, and the said courts shall give such cause precedence."

The facts which make the case are stated in the opinion of the court.

Judgment was rendered against the claim of the Eastern Band to share in the funds named in the act, 20 C. Cl. 449, and this appeal was taken.

*Mr. Assistant Attorney-General Maury* on behalf of the United States stated to the court that they were merely trustee, with no interest in the result of the controversy.

*Mr. Samuel Shellabarger* and *Mr. Jeremiah M. Wilson* for appellants (*Mr. Samuel J. Crawford* and *Mr. J. H. Gillpatrick* were also on the brief, and *Mr. W. T. Curtis* was with them), contended as follows:

1. The claimants are a civil person and a legal entity recognized and known to and organized under the laws of the United States.

2. By the 10th and other articles of the treaty of 1846 they are treated and made to be, although residing east, a part of the Cherokee Nation of Indians.

3. By this same treaty of 1846, the treaty of 1835 has fixed upon it the binding and treaty signification that it secured to the claimant Indians, along with the rest of the Cherokee Nation, a common interest in all the property of the Cherokee Nation, wherever situate and whatever its character.

4. The 10th Article of the treaty of 1846 expressly preserves to the claimant Indians, in their residence at the east, this common interest in all the common property of the Nation, as defined by said treaty of 1835, although still residing east.

5. Articles 1 and 4 of the treaty of 1846, in securing to the whole Cherokee people, including the claimant Indians, an equal interest in the lands of the Nation, further establish the equal interest of the claimant Indians in the common lands of the Nation and the common funds of the Nation.

6. The act of Congress providing for the payment of the proceeds of the sales of the common lands east, made by the treaty of 1835, upon the principles of the opinion of the Attorney General, fixes upon the claimant Indians the character of being a part of the Cherokee Nation, and entitled to their *pro rata* share, under their present organization, of the proceeds of the sale of the common lands.

7. The executive branch of the government has also, under the authority of these laws, recognized them as a part of the Cherokee Nation, and entitled to their *pro rata* share of the proceeds of the sales of the common lands sold under the treaty of 1835.

8. There is no legal or equitable principle which distinguishes between the right of the claimant Indians to receive what was by them received under Article 9 of the treaty of 1846, and their right to recover the moneys claimed in the present case.

9. This recognition by the political branch of the government of their rights as a part of the Cherokee Nation in the common lands and money of the nation, is binding on the courts.

10. Congress has plenary power to regulate the administra-

tion of these public trust funds of Indian tribes, and power to recognize and legalize the division of the tribe in two parts, that residing east and that residing west, and power to provide for an equitable division of the national fund, whether lands, or the proceeds of the sale of lands, or annuities.

11. Congress has, since 1846, expressly provided for the distribution of the proceeds of the sale of part of this land, by affirming the principles of the opinion of the Attorney-General, and by other similar acts of Congress, and has thus bound the judiciary to recognize the status of claimant Indians, and their rights under that status to their proportionate share of the other common lands of the nation and common funds of the nation.

12. It being competent for Congress thus to provide for a geographical separation of the tribe into two parts, and proportionate division of their property, and Congress having done so, it cannot be said that the claimant Indians are in equity not entitled to enjoy their proportion of the national property in and under their separate organization, so legalized by the political branch of the government, and in order to do so that they must abandon the organization so legalized by Congress and the Executive.

13. The treaty of 1866, in its 31st Article, in effect carefully preserves these rights of the claimant Indians, because it preserves such rights unless expressly repealed by that treaty, which rights are not so expressly repealed.

14. The act creating the present jurisdiction is mandatory in requiring the court to render a decree in favor of the claimant Indians for whatever equitable as well as legal right they may have in the proceeds of the sale of land or other trust funds, and the equitable right of the claimant Indians to their proportionate share of both classes of funds is established by the above considerations.

15. The "neutral lands," 800,000 acres, were bought and paid for out of the $5,000,000, in which confessedly the eastern Indians had a proportionate interest, and having been so paid for, and having since been sold, the eastern Indians are in equity entitled to their proportionate share of the purchase

money. And the same principle applies to all other moneys covered by the petition, because such moneys arose from the sale of lands in which claimants had an equal interest proportioned to their numbers with the other Cherokees.

*Mr. S. S. Burdett* and *Mr. William A. Phillips* for appellees.

MR. JUSTICE FIELD delivered the opinion of the court.

This case comes before us on appeal from the Court of Claims. It was brought to determine the right of the petitioners, called the Eastern Band of the Cherokee Indians, to a proportionate part of two funds held by the United States in trust for the Cherokee Nation. One of the funds was created by the treaty with the Nation made December 29, 1835, at New Echota, in Georgia, commuting certain annuities into the sum of $214,000. The other arose from sales of certain lands of the Nation lying west of the Mississippi River.

The suit by the petitioners was authorized by an act of Congress, and it is brought against the United States and the Cherokee Nation. 22 Stat. 582, ch. 141. The United States, however, have no interest in the controversy, as they hold the funds merely as trustee. They stand neutral, therefore, in the litigation, although as a matter of form they have filed an answer traversing the allegations of the petition.

The general ground upon which the petitioners proceed and seek a recovery is, that the Cherokee Indians, both those residing east and those residing west of the Mississippi, formerly constituted one people and composed the Cherokee Nation; that by various treaty stipulations with the United States they became divided into two branches, known as the Eastern Cherokees and the Western Cherokees; and that the petitioners constitute a portion of the former, and as such are entitled to a proportionate share of the funds which the United States hold in trust for the Nation.

This claim is resisted upon the ground that the two branches, into which it is admitted the Nation was once divided, subsequently became reunited, and have ever since constituted one nation, known as the Cherokee Nation, and that as such it pos-

sesses all the rights and property previously claimed by both, and that the petitioners have not, since the treaty of New Echota, constituted any portion of the Nation.

To determine the merits of the respective claims and pretensions of the parties, it will be necessary to give some account of the different treaties between the Cherokees and the United States, and to refer to the several laws passed by Congress to carry the treaties into effect, and accomplish the removal of the Indians from their former home east of the Mississippi to their present country west of that river.

When that portion of North America which is now embraced within the limits of the United States east of the Mississippi was discovered, it was occupied by different tribes or bands of Indians. These people were destitute of the primary arts of civilization, and with a few exceptions had no permanent buildings, occupying only huts and tents. Their lands were cultivated in small patches and generally by women. The men were chiefly engaged in hunting and fishing. From the chase came their principal food, and the skins of animals were their principal clothing. The different tribes roamed over large tracts and claimed a right to the country as their territory and hunting grounds. Of these tribes, the Cherokee Indians constituted one of the largest and most powerful. They claimed the principal part of the country now composing the States of North and South Carolina, Georgia, Alabama, and Tennessee. Their title was treated by the governments established by England, and the governments succeeding them, as merely usufructuary, affording protection against individual encroachment, but always subject to the control and disposition of those governments, at least so far as to prevent, without their consent, its acquisition by others. Such superior right rested upon the claim asserted by England of prior discovery of the country, and was respected by other European nations. There was no nation, therefore, to oppose this assertion of superior right to control the disposition of the lands, and to acquire the title of the Indians, except the Indians themselves; and by treaties with them from time to time their title and interest were ceded to the United States.

On the 28th of November, 1785, the United States made their first treaty with the Cherokees. 7 Stat. 18. It was concluded at Hopewell, on the Keowee, between commissioners representing the United States on the one part and the "head men and warriors of all the Cherokees on the other." By it the Indians, for themselves and their respective tribes and towns, acknowledged that all the Cherokees were under the protection of the United States and of no other sovereign. The treaty promised peace to them and the favor and protection of the United States, on condition of the restoration to liberty of certain prisoners whom they had captured, and of the return of certain property which they had seized. It also prescribed the boundary between them and citizens of the United States of lands allotted to them for their hunting grounds. These lands embraced large tracts within the States mentioned. The ninth article provided that, for the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens or Indians, the United States should " have the sole and exclusive right of regulating the trade with the Indians and managing all their affairs in such manner as they think proper." By this treaty the Cherokees were recognized as one people, composing one tribe or nation, but subject, however, to the jurisdiction and authority of the Government of the United States, which could regulate their trade and manage all their affairs.

On the 2d of July, 1791, another treaty was made with the Cherokees, in which they were described as the " Cherokee Nation." 7 Stat. 39. Its representatives were designated as the " Chiefs and warriors of the Cherokee Nation of Indians," and the first article declared that " there shall be perpetual peace and friendship between all the citizens of the United States of America and all the individuals composing the whole Cherokee Nation of Indians." And the chiefs and warriors, "for themselves and all parts of the Cherokee Nation," acknowledged themselves and the Cherokee Nation to be under the protection of the United States and of no other sovereign. The treaty also renewed the agreement, on the part of the Cherokees, that the United States should have the sole and ex-

clusive right of regulating their trade; and readjusted the boundary· between citizens of the United States and •the "Cherokee Nation," by which the hunting grounds were reduced in quantity; and in ·consideration of this reduction the United States agreed to deliver certain valuable goods to the chiefs and warriors for the use of the Nation, and to pay to the Nation annually the sum of $1000. A further article increased the amount to $1500.

The boundary of 'the hunting grounds was from time to time changed by subsequent treaties, and by each succeeding one their extent was reduced; in consideration of which a larger quantity of goods was promised to the Nation; and the annuity was increased until, in the year 1805, it amounted to .$10,000. 7 Stat. 43, 62, 93. This annuity was regularly paid to the Cherokee Nation, as represented by. the Indians occupying territory east of the Mississippi River, until the treaty of July 8, 1817. 7 Stat. 156. That treaty originated from a division in opinion among the Cherokees as to their mode of. life, which existed when the first treaty with the United States was made, in 1785, and which had from that time increased. There were numerous settlements or towns within the territory allotted to the Indians. Those who occupied the upper towns, which were mostly in the State of North Carolina, desired to engage in the pursuits of agriculture and civilized life, whilst those who occupied the lower towns, in the valley of the Mississippi, desired to continue " the hunter life," and, owing to the scarcity of game where they lived, to remove across the Mississippi River to vacant lands of the United States. As early as 1808 a deputation from the upper and lower towns, authorized by the Cherokee Nation, came to Washington to declare to the President their desires and inform him of the impracticability of uniting the whole Nation in the pursuits of civilized life, and to request the establishment of a division line between the two classes of towns. The treaty of ·817, which was made with "the chiefs, head men, and warriors of the Cherokee Nation east of the Mississippi River, and the chiefs, head men, and warriors of the Cherokees on the Arkansas River," recites the action of this deputation

and the reply of the President to the parties, made on the 9th of January, 1809, which was, in substance, that the United States were the friends of both parties, and, as far as could be reasonably asked, were willing to satisfy the wishes of both; that those who remained might be assured of their patronage, aid, and good neighborhood; that those who wished to remove would be permitted to send an exploring party to reconnoitre the country on the west of the Arkansas and White Rivers and higher up; that when this party should have found a tract of country suiting the emigrants and not claimed by other Indians, the United States would arrange with them to exchange it for a just proportion of the country they should leave, and to a part of which, according to their numbers, they had a right; and that every aid towards their removal, and what would be necessary for them there, would then be freely extended to them.

The treaty recites that, relying upon these promises of the President, the Cherokees explored the country on the west side of the Mississippi, and made choice of the country on the Arkansas and White Rivers, and settled upon lands of the United States to which no other tribe of Indians had any just claim, and that they had duly notified the President thereof, and of their desire for a full and complete ratification of his promise. To that end, as notified by him, they had sent their agents with full powers to execute a treaty, relinquishing to the United States their right, title and interest to all lands belonging to them as part of the Cherokee Nation, "which they had left and which they were about to leave, proportioned to their numbers, including with those now on the Arkansas those who were about to remove thither." The treaty then proceeds to recite that, to carry into effect in good faith the promises of the President, and to promote a continuation of friendship with their brothers on the Arkansas River, and for that purpose to make an equal distribution of the annuities secured by the United States to the whole Cherokee Nation, its articles were agreed upon. These were, in substance, that the chiefs, head men, and warriors of the whole Cherokee Nation ceded to the United States certain lands lying east of

the Mississippi, and the United States, in exchange for them, bound themselves to give to that branch of the Cherokee Nation on the Arkansas as much land on that river and the White River as they had received or might thereafter receive from the Cherokee Nation east of the Mississippi, " acre for acre, as the just proportion due that part of the Nation on the Arkansas, agreeably to their numbers." The United States also agreed to give to each poor warrior who might remove to the western side of the Mississippi a rifle gun with ammunition and other articles, to pay for all improvements of real value to their lands, and to give of the lands surrendered to the United States, to every head of an Indian family residing on the east side of the Mississippi, who might wish to become a citizen of the United States, 640 acres. It was also agreed that the annuity due to the whole Nation for the year 1818 should be divided between the two branches of the Nation, according to their respective numbers, to be ascertained by a census to be taken. Previous treaties between the United States and the Cherokee Nation were to continue in force with both of its branches, each to be entitled to all the immunities and privileges which the " old Nation." enjoyed under them.

On the 27th of February, 1819, another treaty was made with the Cherokee Nation, 7 Stat. 195, represented by its chiefs and head men. By it a further cession of lands was made to the United States, and it was agreed that the annuity to the Nation should be paid as follows: two-thirds to the Cherokees east of the Mississippi, and one-third to the Cherokees west of that river. This apportionment was based upon an estimate, that those who had emigrated and those who were enrolled for emigration constituted one-third of the Nation, instead of upon a census to be taken as mentioned in the treaty of 1817. The annuity thus divided was regularly paid as stipulated until commuted by the treaty of December, 1835, of which we shall presently speak.

On the 6th of May, 1828, a treaty was made with the chiefs and head men of the Cherokee Nation of Indians west of the Mississippi. 7 Stat. 311. This was the first time the Cherokees west of the river were recognized as so far a distinct and sepa-

rate political body from the Cherokees east of the river as to call for separate treaty negotiations with them. The treaty recited, as among the causes of its being made, that it was the anxious desire of the government to secure to the Cherokee Nation of Indians, as well those then living within the limits of Arkansas as those of their friends and brothers residing in States east of the Mississippi, who might wish to join their brothers west, a permanent home which should, under the guarantee of the United States, remain forever theirs, and that the present location of the Cherokees in Arkansas was unfavorable to their repose, and tended to their degradation and misery. By it the United States agreed to put the Cherokees in possession of, and to guarantee to them for ever, seven millions of acres of land which were specifically described, and which are situated in what is now known as the Indian Territory, and also to give and guarantee to the Cherokee Nation a perpetual outlet west of these lands, and a free and unmolested use of the country so far as their sovereignty and right of soil extended. They also agreed to pay for all improvements on the land abandoned, and, in order to encourage the emigration of their brothers remaining in the States, to give to each head of a Cherokee family then residing within any of the States east of the Mississippi, who might desire to remove west, on enrolling himself for emigration, a good rifle and certain other articles, to make just compensation for their property abandoned, to bear the cost of their emigration, and to procure provisions for their comfort, accommodation, and support by the way, and for twelve months after their arrival at the agency. On the other hand, the chiefs and head men of the Cherokee Nation west re-ceded to the United States the lands to which they were entitled on the Arkansas under the treaties of July 8, 1817, and of February 27, 1819, and agreed to remove from the same within fourteen months.

From this time until the treaty of New Echota, concluded December 29, 1835, 7 Stat. 478, the Cherokees were divided into two branches, so far constituting distinct political bodies that the United States had separate negotiations with each; and on the 14th February, 1833, by a treaty with the chiefs

and head men of the Cherokee Nation west of the Mississippi, the United States renewed their guarantee of the seven millions of acres, and of the perpetual outlet to the nation west of those lands, and of the free and unmolested use of the country west. 7 Stat. 413.

In the meantime—from the treaty of 1828 until the treaty of New Echota—the Cherokees remaining east of the Mississippi were subjected to harassing and vexatious legislation from the States within which they resided. The United States had, as early as 1802, agreed with Georgia, in consideration of her cession of western lands, to extinguish the Indian title to lands within the State. North Carolina claimed that the United States were under a similar obligation to extinguish the Indian title to lands within her limits, in consideration of a like cession of western lands, although there was no positive agreement to that effect. And with the extinguishment of their title, it was expected that the Indians themselves would be removed to territory beyond the bounds of those States. At the time the treaty of 1828 was made, a great deal of impatience had been exhibited by the people of those States at the little progress made in the extinguishment of the Indian title, and at the continued presence of the Indians. Severe and oppressive laws were passed by Georgia in order to compel them to leave; and, though less severity was practised in North Carolina towards the Indians in that State, an equally pronounced desire for their departure was expressed. Angry and violent disputes between them and the white people in both States, but more particularly in Georgia, were of frequent occurrence. See case of *Cherokee Nation* v. *State of Georgia*, as reported in a separate volume by Richard Peters in 1831; also a document called "The Public Domain," prepared by the Public Land Commission, and published as Ex. Doc. 47 of H. of R., 46th Cong., 3d Session; and Doc. No. 71 of H. of R., 23d Cong., 1st Session.

The treaty of New Echota was made to put an end to those troubles and to secure the reunion of the divided nation. It recites as motives to its negotiation, among other things, that the Cherokees were anxious to make some arrangement with the Government of the United States, whereby the difficulties

they had experienced from residence within the settled parts of the country under the jurisdiction and laws of the State governments, might be terminated and adjusted, and they be reunited into one body, and be secured a permanent home for themselves and their posterity in the country selected by their forefathers, without the territorial limits of the State sovereignties, and where they could establish and enjoy a government of their choice, and perpetuate such a state of society as might be most consonant with their views, habits, and conditions, and as might tend to their individual comfort and their own advancement in civilization. By its stipulations the Cherokees ceded to the United States all the lands owned, claimed, or possessed by them east of the Mississippi River, and all claims for spoliations of every kind, for the sum of $5,000,000, and agreed to remove to "their new home" west of the Mississippi within two years from its ratification.

The treaty also recited the cession to the Cherokee Nation by previous treaties of the 7,000,000 acres; and the guarantee of a perpetual outlet west of these lands, and a free and unmolested use of all the country, so far as the sovereignty of the United States and their right to the soil extended; and also that it was apprehended by the Cherokees that in this cession there was not a sufficient quantity of land for the accommodation of the whole nation, and, therefore, the United States agreed, in consideration of $500,000, to convey by patent to the Indians and their descendants an additional tract of 800,000 acres; and that the land previously ceded, including the outlet, should be embraced in the same patent. (Art. 2.) They also agreed to remove the Indians to their new home, and to subsist them one year after their arrival there, except that such persons and families, as in the opinion of "the emigrating agent" were capable of subsisting and removing themselves, should be permitted to do so, and should be allowed for all claims for the same $20 for each member of their families; and, in lieu of their one year's rations, should be paid the sum of $33.33, if they preferred it. (Art. 8.)

It was also agreed that, after deducting the amount which should be actually expended for the payment for improvements,

claims for spoliations, removal, subsistence, and debts and claims upon the Cherokee Nation, and for the additional quantity of lands and goods for the poorer class of Cherokees, and the several sums to be invested for the general national funds provided for in the several articles of the treaty, the balance, whatever the same might be, should be equally divided between all the people belonging to the Cherokee Nation east according to the census completed, and such Cherokees as had removed west after June, 1833; and that those individuals and families that were averse to removal and were desirous to become citizens of the State wherein they resided, and such as were qualified to take care of themselves and their property, should be entitled to receive their due proportion of all the personal benefits arising under the treaty for their claims, improvements, and their *per capita*, as soon as an appropriation was made to carry out the treaty. (Arts. 12 and 15.)

By the eleventh article, " the Cherokees, believing it will be for the interest of their people to have all their funds and annuities under their own direction and future disposition," agreed to commute their permanent annuity of $10,000 for the sum of $214,000, the same to be invested by the President of the United States as part of the general fund of the nation.

In the following year Congress made the requisite appropriation for the commutation, and, according to the tenth article of the treaty, the money was invested " for the benefit of the whole Cherokee Nation," which had removed, or should subsequently remove, to the lands assigned to it west of the Mississippi. This is one of the funds of which the petitioners claim a part, in proportion to their numbers as compared with the citizens of the Cherokee Nation living west of the Mississippi on the territory ceded. The provisions of the treaty as to the investment, custody and distribution of the income of this fund, and all other funds belonging to the nation, remained in force until the treaty of July 19, 1866. The interest was paid over annually to the agents of the Cherokee Nation authorized to receive the same, and was subject to application by its council to such purposes as they deemed best for the general interests of their people. The treaty of 1866, Article 23, 14 Stat. 799, 805,

provided that all funds then due the nation, or that might there-after accrue from the sale of its lands by the United States, as provided for, should be invested in United States registered stocks at their current value, and the interest on all said funds should be paid semi-annually on the order of the Cherokee Nation, and be applied to the following purposes, to wit: thirty-five per cent. for the support of the common schools of the nation and educational purposes, fifteen per cent. for the orphan fund, and fifty per cent. for general purposes, including reasonable salaries of district officers.

Immediately after the ratification of the treaty of 1835 measures were taken by the government to secure its execution, and commissioners were appointed to adjust claims for improvements and to facilitate the emigration of the Indians. But emigration proceeded slowly. Great reluctance to go was manifested by large numbers, and at last it became necessary to make a display of force to compel their removal. Major-General Scott was sent to the country with troops, and instructed to remove all the Indians except such as were entitled to remain and become citizens under the twelfth article of the treaty. The number that remained was between eleven and twelve hundred. They were without organization or a collective name. They ceased to be part of the Cherokee Nation, and henceforth they became citizens of and were subject to the laws of the State in which they resided. The name of the Eastern Cherokees accompanied those who emigrated, to distinguish them from those who had preceded them and who were called old settlers.

After the reunion of the Cherokee people on their lands west of the Mississippi, resulting from the execution of the treaty, and on the 12th of July, 1839, the following act of union between the Eastern and Western Cherokees was adopted:

"*Act of Union between the Eastern and Western Cherokees.*

"Whereas our fathers have existed as a separate and distinct nation, in the possession and exercise of the essential and appropriate attributes of sovereignty, from a period extending

into antiquity, beyond the records and memory of man; and whereas, these attributes, with the rights and franchises which they involve, remain still in full force and virtue, as do also the national and social relation of the Cherokee people to each other and to the body politic, excepting in those particulars which have grown out of the provisions of the treaties of 1817 and 1819 between the United States and the Cherokee Nation, under which a portion of our people removed to this country and became a separate community (but the force of circumstances have recently compelled the body of the Eastern Cherokees to remove to this country, thus bringing together again the two branches of the ancient Cherokee family), it has become essential to the general welfare that a union should be formed and a system of government matured adapted to their present condition, and providing equally for the protection of each individual in the enjoyment of all his rights :

"Therefore we, the people composing the Eastern and Western Cherokee Nation, in national convention assembled, by virtue of our original unalienable rights, do hereby solemnly and mutually agree to form ourselves into one body politic, under the style and title of the Cherokee Nation.

"In view of the union now formed, and for the purpose of making satisfactory adjustment of all unsettled business which may have arisen before the consummation of this union, we agree that such business shall be settled according to the provisions of the respective laws under which it originated, and the courts of the Cherokee Nation shall be governed in their decisions accordingly. Also, that the delegation authorized by the Eastern Cherokees to make arrangements with Major-General Scott for their removal to this country shall continue in charge of that business, with their present powers, until it shall be finally closed; and, also, that all rights and titles to public Cherokee lands on the east or west of the River Mississippi, with all other public interests which may have vested in either branch of the Cherokee family, whether inherited from our fathers or derived from any other source, shall henceforward vest entire and unimpaired in the Cherokee Nation as constituted by this union.

"Given under our hands, at Illinois camp grounds, this twelfth day of July, 1838.

" By order of the national convention.

" GEORGE LOWRY,
" *President of the Eastern Cherokees.*

his
" GEORGE x GUESS,
mark.
" *President of the Western Cherokees.*"

On the 6th of September following they adopted a constitution of government, in which they recited that the Eastern and Western Cherokees had become reunited in one body politic, under the style and title of the Cherokee Nation. The second clause of its first article is as follows :

"The lands of the Cherokee Nation shall remain common property; but the improvements made thereon, and in the possession of the citizens of the nation, are the exclusive and indefeasible property of the citizens respectively who made, or may rightfully be in possession of, them: *Provided*, that the citizens of the nation, possessing exclusive and indefeasible right to their improvements, as expressed in this article, shall possess no right or power to dispose of their improvements in any manner whatever to the United States, individual States, or to individual citizens thereof; and that whenever any citizen shall remove with his effects out of the limit of this nation and become a citizen of any other government, all his rights and privileges as a citizen of this nation shall cease : *Provided, nevertheless*, that the national council shall have power to readmit by law to all the rights of citizenship any such person or persons who may at any time desire to return to the nation, on memorializing the national council for such readmission."

But notwithstanding this declared reunion of the divided Cherokees, there was much bitter feeling between the old settlers and the new-comers, leading to violent contests, and causing, in many instances, great loss of property and life. The new-comers, being the more numerous, claimed to control the government of the country, and endeavored to compel the old

settlers to submit to their rule.  The old settlers had an organization of their own and complained that the new-comers occupied their lands and overthrew their organization.  And among the new-comers, also, there was bitterness between those who had favored the treaty of removal from the east side of the Mississippi and those who had opposed it.  The former sided with the old settlers, but the latter outnumbered both.  Violent measures were resorted to on both sides to carry out their purposes, and there was little security for person or property. The situation became intolerable, and in 1845 the contending factions—the old settlers, the treaty party, and the anti-treaty party—sent delegates to Washington to lay their grievances before the officials of the United States Government, in the hope that some relief might be afforded to them.  The old settlers and the treaty party desired a division of the people into two nations and a division of the Territory.  Demands also were made by each party against the United States under the stipulations of the treaty of New Echota.  These circumstances led to the treaty of August 6, 1846.  9 Stat. 871.  It was negotiated on the part of the Cherokees by delegates appointed by the regularly constituted authorities of the Cherokee Nation, and by delegates appointed by and representing that portion of the Cherokee tribe known as the treaty party, and by delegates appointed by and representing that portion of the tribe known and recognized as Western Cherokees or the old settlers.  It recited that serious difficulties had for a considerable time existed between the different parties of the people constituting and recognized as the Cherokee Nation of Indians, which it was desirable should be speedily settled, so that peace and harmony might be restored among them; and that certain claims existed on the part of the Cherokee Nation and portions of the Cherokee people against the United States; and that, with a view to the final and amicable settlement of these difficulties and claims, the parties had agreed to the treaty.

It declared that all difficulties and differences existing between the several parties of the Cherokee Nation were settled and adjusted, and that they should, as far as possible, be for-

gotten and forever buried in oblivion; that all party distinctions should cease, except so far as they might be necessary to carry the treaty into effect; that a general amnesty should be proclaimed; and that all offences and crimes committed by a citizen or citizens of the Cherokee Nation against the nation or an individual were pardoned. It was agreed also that all parties were to unite to enforce laws against future offenders, and that laws should be passed for equal protection and for security of life, liberty and property. Thus the personal dissensions were to a great extent healed.

The treaty also declared that the lands occupied by the Cherokee Nation should be secured to the whole Cherokee people for their common use and benefit, and that a patent should be issued for the same, including the eight hundred thousand acres purchased, together with an outlet west, thus recognizing that all the lands ceded by the United States for the benefit of the Cherokees west of the Mississippi belonged to the entire Nation, and not to any of the factions into which the Nation was divided. The treaty also made provision for the adjustment and payment of the claims of different parties. The 9th Article is as follows:

"The United States agree to make a fair and just settlement of all moneys due to the Cherokees and subject to the *per capita* division under the treaty of 29th December, 1835, which said settlement shall exhibit all money properly expended under said treaty, and shall embrace all sums paid for improvements, ferries, spoliations, removal, and subsistence and commutation therefor, debts and claims upon the Cherokee Nation of Indians, for the additional quantity of land ceded to said nation; and the several sums provided in the several articles of the treaty to be invested as the general funds of the nation; and also all sums which may be hereafter properly allowed and paid under the provisions of the treaty of 1835. The aggregate of which said several sums shall be deducted from the sum of six million six hundred and forty-seven thousand and sixty-seven dollars, and the balance thus found to be due shall be paid over *per capita* in equal amounts to all those individuals, heads of families, or their legal representatives, entitled

to receive the same under the treaty of 1835 and the supplement of 1836, being all those Cherokees residing east at the date of said treaty and the supplement thereto."

By the treaty of July 19, 1866, 14 Stat. 799, provision was made for the settlement of friendly Indians on certain unoccupied lands of the Cherokees west of the Mississippi, and for the sale of their interest, and also for the sale of other lands belonging to them in the State of Kansas, and the investment of the proceeds in registered stocks of the United States for the benefit of the Cherokee Nation. Under it, and pursuant to other laws, sales were made of the lands mentioned, and also of other lands west of the Mississippi ceded to the Cherokees under the different treaties, to which we have referred, and the proceeds have been duly invested, as required by article twenty-third of the treaty. The investment constitutes one of the funds of which the petitioners seek a proportionate part.

Their claim, however, rests upon no solid foundation. The lands from the sales of which the proceeds were derived belonged to the Cherokee Nation as a political body, and not to its individual members. They were held, it is true, for the common benefit of all the Cherokees, but that does not mean that each member had such an interest, as a tenant in common, that he could claim a *pro rata* proportion of the proceeds of sales made of any part of them. He had a right to use parcels of the lands thus held by the Nation, subject to such rules as its governing authority might prescribe; but that right neither prevented nor qualified the legal power of that authority to cede the lands and the title of the Nation to the United States. Our government, by its treaties with the Cherokees, recognized them as a distinct political community, and so far independent as to justify and require negotiations with them in that character. Their treaties of cession must, therefore, be held not only to convey the common property of the Nation, but to divest the interest therein of each of its members. Such was substantially the language, and such the decision of the Attorney General of the United States in a communication made to the President in 1845, with reference to the treaty of New Echota. "The Executive of the United States," he said, "must, there-

fore, regard the treaty of New Echota as binding on the whole Cherokee tribe; and the Indians, whether in Georgia, Alabama, Tennessee, or North Carolina, are bound by its provisions. As a necessary consequence, they are entitled to its advantages. The North Carolina Indians, in asking the benefit of the removal and subsistence commutation, necessarily admit the binding influence of the treaty on them and their rights. They cannot take its benefits without submitting to its burdens. The Executive must regard the treaty as the supreme law, and as a law construe its provisions." Attorney-General Mason, 4 Opins. Attys. Gen. 435, 437.

Whatever rights, therefore, the Cherokees in North Carolina, who refused to join their countrymen in the removal to the lands ceded to them west of the Mississippi, can claim in the funds arising from sales of portions of such lands, or in the fund created by a commutation of the annuities granted upon cessions of the lands of the Cherokee Nation, must depend entirely upon the treaties out of which those funds originated. They have as yet received nothing from either of them, and they can claim nothing by virtue of the fact that the lands of the Nation, which its authorities ceded to the United States, were held for the common benefit of all the Cherokees. All public property of a nation is supposed to be held for the common benefit of its people; their individual interest is not separable from that of the Nation.

The Cherokees in North Carolina dissolved their connection with their Nation when they refused to accompany the body of it on its removal, and they have had no separate political organization since. Whatever union they have had among themselves has been merely a social or business one. It was formed in 1868, at the suggestion of an officer of the Indian office, for the purpose of enabling them to transact business with the Government with greater convenience. Although its articles are drawn in the form of a constitution for a separate civil government, they have never been recognized as a separate Nation by the United States; no treaty has been made with them; they can pass no laws; they are citizens of that State and bound by its laws. As well observed by the Court

of Claims, in its exhaustive opinion, they have been in some matters fostered and encouraged by the United States, but never recognized as a Nation in whole or in part. 20 C. Cl. 449–483.

Nor is the band, organized as it now is, the successor of any organization recognized by any treaty or law of the United States. Individual Indians who refused to remove west, and preferred to remain and become citizens of the States in which they resided, were promised certain moneys, but there is no evidence that the petitioners have succeeded to any of their rights. The original claimants have probably all died, for fifty years have elapsed since the treaty of 1835 was made, and no transfer from them or their legal representatives is shown. But assuming that the petitioners properly represent all rightful demands of the Cherokees living in North Carolina when the treaty was made, what were those demands? As designated by articles twelve and fifteen of the treaty, these Cherokees were to receive "their due portion of all the personal benefits accruing under the treaty, for their claims, improvements, and *per capita.*" The term "claims" had reference to demands for spoliations of their property which existed prior to the treaty. The improvements were those made on the property ceded. By *per capita* was meant the proportionate amount, given to each Cherokee east not choosing to emigrate, of the money received on the cession of the lands east of the Mississippi, after deducting certain expenditures mentioned in article. fifteen. Whatever may have remained for the *per capita* distribution, of the $5,000,000 received for the lands after the deductions mentioned, it is plain that it constituted no portion of the moneys that formed the fund of which the petitioners seek by this suit a proportionate part. By the treaty of 1846 certain sums were allowed in addition to the $5,000,000 specified in the treaty of 1835, and from the whole amount certain items, other than those three designated, were to be deducted, and the balance was to be paid over *per capita* in equal amounts to all the individuals, heads of families, or their legal representatives entitled to receive it under that treaty. But this change in no respect affects the case.

When the treaty of 1846 was under negotiation, one William H. Thomas appeared in Washington as the representative of Cherokees in North Carolina and urged a recognition of their demands for the *per capita* money and the removal and subsistence money under articles eight and twelve of the treaty of 1835. He had obtained a statement from one of the commissioners who negotiated that treaty on the part of the United States, from several respectable persons who were privy to the negotiations, and from some of the Cherokees who signed the treaty, as to the meaning which should be given to certain terms used in it, and we are referred to these documents as though they should have some influence upon the construction of those terms. But it is too plain for controversy that they cannot be used to control the language of the treaty or guide in its construction.

The *per capita* money and removal and subsistence money had not been paid when the treaty of 1846 was made, but the Court of Claims finds that since then they have been paid. The claim now presented by the Cherokees of North Carolina to a share of the commuted annuity fund of $214,000, and of the fund created by sales of lands west of the Mississippi ceded to the Cherokee Nation, resting, as it does, upon the designation in the treaties of the lands originally possessed by the Cherokees and ceded to the United States, or subsequently acquired by them from the United States, as "the common property of the nation," or as held for the "common use and benefit" of the Cherokee people, has no substantial foundation. If Indians in that State, or in any other State east of the Mississippi, wish to enjoy the benefits of the common property of the Cherokee Nation, in whatever form it may exist, they must, as held by the Court of Claims, comply with the constitution and laws of the Cherokee Nation and be readmitted to citizenship as there provided. They cannot live out of its Territory, evade the obligations and burdens of citizenship, and at the same time enjoy the benefits of the funds and common property of the Nation. Those funds and that property were dedicated by the constitution of the Cherokees, and were intended by the treaties with the United States, for the benefit of the united Nation,

and not in any respect for those who had separated from it and become aliens to their Nation. We see no just ground on which the claim of the petitioners can rest to share in either of the funds held by the United States in trust for the Cherokee Nation; and the decree of the Court of Claims must, therefore, be                                                    *Affirmed.*

