**UNITED STATES v. PARTON et al.**

No. 366.

District Court, W. D. North Carolina.

Sept. 3, 1942.

T. L. Caudle, Dist. Atty., of Wadesboro, N. C., and W. M. Nicholson, of Lincolnton, N. C., and Worth McKinney, of Asheville, N. C., Asst. U. S. Attys., for plaintiff.

W. Roy Francis, of Waynesville, N. C., for defendants.

WEBB, District Judge.

This action was instituted by the United States to enjoin the defendants, Cherokee Indians, from trading on the lands occupied by the Eastern Band of Cherokee Indians in Swain County, without a license from the Commissioner of Indian Affairs. The complaint alleges that the United States is the owner in fee of these Indian lands and that the defendants are Indians of less than full blood in possession of a tract of land within the boundary occupied by the Eastern Band of Cherokee Indians; and that the defendants are engaged in trading on that tract of land in open violation of the laws of the United States. The Government contends that the defendants are not entitled to trade on the Indian lands because they are not licensed by the Commissioner of Indian Affairs. In their answer the defendants assert that they have regarded themselves as full blooded Cherokee Indians and that the laws of the United States governing Indian "reservations" do not apply to the Cherokee Indian Reservation in North Carolina, since "in contemplation of law the Cherokee Boundary is not a reservation"; and that the defendants are deprived of a license to trade because the Commissioner of Indian Affairs has arbitrarily refused and neglected to issue a Trader's License.

This matter came on to be heard on the Government's motion for a preliminary injunction. After hearing both sides, the Court requested briefs, which have been filed and carefully studied and considered.

I have found as a fact that these defendants are both full blooded Indians. They now run a little business in a storeroom in which their father did a trader's business for twenty-five or thirty years. This storeroom is now owned or claimed to be owned by the two defendants. They have leased this storeroom heretofore with the approval of the Superintendent of the Indian lands and with the approval of the Commissioner of Indian Affairs, and from this rental they had derived considerable revenue, the last lease paying them $35.00 per month for the use of the said storeroom. This storeroom is located in the Cherokee village on a lot 100 feet x 200 feet. It is in this storeroom that the defendants are now carrying on a small trader's business.

The history of these Indian lands in Swain and Cherokee Counties is an interesting one. I do not propose to go into a lengthy description of them, but I do think it proper to make a brief statement about them. I might preface this statement by saying that the United States Government does not own and never has owned a foot of these Indian lands. The title to all the acreage came direct from the State of North Carolina by grant or otherwise. The State of North Carolina owned this land before the Constitution was formed or even before the Declaration of Independence was made. These lands have often been called an Indian reservation, but they are not an Indian reservation because the Government has never owned any part of it to enable it to make a reservation. I think it is well understood that an Indian reservation is a part of the public domain set apart by proper authority for the use and occupation by a tribe or tribes of Indians. Forty-Three Cases Cognac Brandy, C.C., 14 F. 539.

When the Treaty of New Echota was signed by the Cherokee Indian Nation, which once occupied most of Western North Carolina, and the United States, the Cherokee Indians in this Treaty agreed to move their tribe and nation west of the Mississippi to occupy lands furnished them as a part of the public domain in the Indian country or territory. This movement of the Cherokee Nation took place in 1834 and 1835. Practically all the Cherokee Indians comprising the Nation did move West, according to the provision of the Treaty. However, there were some recalcitrant Indians who refused to go West, some four or five hundred or more. General Scott with part of the United States Army was sent into Western North Carolina to round up the remnants of this tribe of Indians and transport them to the Indian country in the West designated in the Treaty. But General Scott and his army could not catch all the rebellious or recalcitrant Indians, and finally the task was given up and the remaining Indians were left to wander about in the mountains of North Carolina, Georgia, and Tennessee, without homes or even places to lay their heads. After years of such wandering, a kind hearted man by the name of Colonel Thomas, who had been an Indian agent and had lived a good part of his life with Indians, conceived the idea of buying a large tract of land in Western North Carolina for the purpose of gathering up these wandering and homeless Indians and placing them on this land. This he did. The wandering Indians came in one by one, settled on this land so bought by Colonel Thomas, and from those wandering Indians have descended something like three thousand Indians who now occupy the tract of land consisting of something like sixty-seven thousand acres in the counties of Swain and Cherokee. However, before Colonel Thomas undertook his scheme of collecting the wandering Indians, the Legislature of North Carolina made a law providing that these wandering and recalcitrant Indians might remain in North Carolina so long as they made good citizens, etc.

The Supreme Court of the United States in the case of the Cherokee Trust Funds (Eastern Band of Cherokee Indians v. United States), 117 U.S. 288, 303, 6 S.Ct. 718, 724, 29 L.Ed. 880, after considering the fact that these recalcitrant Indians did not accompany their Nation or Tribe across the Mississippi, said, "They ceased to be part of the Cherokee nation, and henceforth they became citizens of and were subject to the laws of the state in which they resided." And further, at page 309 of 117 U.S., at page 728 of 6 S.Ct., "They have never been recognized as a separate nation by the United States; no treaty has been made with them; they can pass no laws; they are citizens of that state, and bound by its laws. As well observed by the court of claims, in its exhaustive opinion, they have been in some matters fostered and encouraged by the United States, but never

recognized as a nation, in whole or in part." It is further stated in this opinion that these recalcitrant Indians are not the successor of any organization organized by any treaty or law of the United States. From the foregoing statement, I clearly conclude that this Eastern Band of Cherokee Indians is not a Tribe or a Nation.

Section 261, Title 25, U.S.C.A. upon which the complainant relies, reads in part: "The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian *tribes*." In the gradual assumption of authority over this band of Indians, the Commissioner of Indian Affairs, through his counsel in this Court, now contends that he has the power to appoint traders to this Indian band. Adhering to the plain letter of the law and the decision of the Supreme Court of the United States, I cannot approve such a position. In the light of the decisions, I would have to strain my construction of statutory law to hold that because the Congress has given the Commissioner of Indian Affairs the power to appoint traders to Indian *Tribes,* he also has the power to appoint traders to this little band of Indians, which is not a Nation or a Tribe, but a band of rebel Indians living on North Carolina land, which land was never owned, as said before, by the Federal Government.

The next law relied upon by the plaintiff is Section 262 of the Code, which reads in part: "Any person desiring to trade with the Indians on any Indian *reservation* shall", etc. It will be seen again that Congress is careful to give the Commissioner the power to grant permits to traders with Indians on an Indian *Reservation.* No one will contend that this body of sixty-seven thousand acres of land which was bought for the Indians from the State of North Carolina has ever been or is now a Reservation. No Act of Congress has made it so; no executive order has made it so; nor has any treaty undertaken to make it so. Therefore, it is in no sense a Reservation, and I cannot see how this section of the Code applies to this tract of land; but assuming as a fact, and only assuming it, that this band of Indians is a Nation or Tribe, and that this boundary of land is a Reservation, then the question arises whether or not the Commissioner of Indian Affairs has acted arbitrarily in refusing these two Indian girls, twins, and thirty years old, a trader's permit.

I found as a fact that on January 3, 1942, the defendant, Marion T. Parton, sister of Amy Tahquette, went to the Office of the Superintendent of the Cherokee Indian Agency and made known to the Superintendent their desire to open a grocery and mercantile business in their store building, which, as said before, was owned by their father, and in which he had a mercantile business for twenty-five or thirty years. I have also found that the Superintendent advised her that before she could open a business in said store she would be required to file an application for a Trader's License and file a bond in the sum of ten thousand dollars, guaranteeing fair dealing with the Indians and the general public, making certifications for themselves and their clerks, together with statements as to their business ability; that Mr. Blair further advised that it would be necessary to purchase the improvements placed on the lot by the former lessor, Mr. McAlhaney, before approval could be had from the Agency; that on or about January 5, 1942, all the requirements of the Agency were met by the defendants, and at that time the Superintendent of said Agency advised the defendant, Marion T. Parton, that she would be required to sign a statement showing that L. F. McAlhaney had no interest in any capacity in the proposed business; whereupon, said statement was duly signed and a copy of same appears in the record; that upon receipt of all the required papers, statements, and bond, the Superintendent, Mr. Blair, stated to the defendant that he knew of no reason why a Trader's License should not be granted to the defendants, and for them to proceed with their plans to open their store; that the said papers were immediately forwarded to the Commissioner of Indian Affairs in Washington, with a statement from the Superintendent of the Agency, Mr. Blair, that the applicants had met all the requirements for a license; that several days thereafter the Superintendent addressed a letter to the defendant, Marion T. Parton, stating in part as follows: "On January 5 right after you came to see me about a license to operate your store in your building in the Cherokee village, I wrote the Commissioner of Indian Affairs advising him your desires. I just received a letter stating that this matter should be held in abeyance until the McAlhaney matter has been cleared up."

It will be seen from this finding of fact that the defendants have complied with all

the requirements of the Cherokee Indian Agency in their efforts to obtain a Trader's License to do business in their own store building on the Cherokee Boundary, in addition to purchasing McAlhaney's improvements for approximately twelve hundred dollars, as suggested by the Agency; and that the defendants have cooperated fully in all respects with the Agency in conducting their business affairs on said Boundary.

I have secured from the Assistant District Attorney, one of the representatives of the Government in this case, blanks entitled "Information Concerning Applicant for Trader's License," and I am filing these blanks as a part of the exhibits in this case. This blank is to be submitted to some person who knows the applicant, requiring the person to state that he or she is personally acquainted with the applicant, and requiring the person to state whether he is over twenty-five years of age, giving legal residence and how long he has lived there; whether he is well acquainted with the applicant, and how long he has known the applicant; whether he is related to the applicant; whether the applicant has been in his employ; whether the applicant has been in business before hand and for how long a period; of what state or territory the applicant is a legal resident, and how long the applicant has resided therein; of what town, city, county, or parish the applicant is a legal resident, and how long the applicant has resided there; whether the applicant uses intoxicating liquors; whether the applicant is a person of good moral character; whether the applicant is a person of good repute; what experience the applicant has or possesses which especially fits her for fulfilling the duties for which the application is made; whether the person is aware of any circumstances tending to disqualify applicant for the position applied for; and the seventeenth question: "Would you yourself trust applicant with the employment requiring undoubted honesty, and would you recommend applicant for such to your personal friends?"

It will be seen that this blank contains seventeen questions to be answered about or concerning the applicant for a Trader's License. These questions were undoubtedly answered by some person qualified to make answers and filed with the Commissioner of Indian Affairs through the Superintendent, Mr. Blair.

The other blank is entitled: "Application for License as Indian Trader." This blank is to be signed by the applicant; states that the applicant hereby applies for a license to conduct a business among the Tribe of Indians to be located at ——————— on ——— Reservation. The amount of capital to be employed in the business is ———, and the firm will consist of ———, and the firm name will be ———. The number of clerks is to be set forth, and the applicant agrees during the continuance of the license to observe rules and regulations relating to trade with the Indians prescribed by the Indian Office, and "Enclosed herewith bond for $10,000.00 for the faithful observance of such regulations." Then the following questions on the blank are to be answered by the applicant:

1. Christian name.

2. Date and place of birth.

3. Are you a citizen of the United States?

4. Of what state or territory are you a legal resident? How long have you been a legal resident thereof? Of what town, city, county or parish are you a resident? How long have you been a resident thereof?

5. In what places have you resided, and what has been your occupation during each year for the past five years?

6. Are you married? If so, how many members in the family, and how many will be with you upon the Reservation?

7. Have you ever been indicted or convicted of any crime?

8. What experience have you had, or what qualification do you possess which especially fits you for carrying on the business of an Indian trader?

9. Do you or any of your prospective employees use intoxicating liquors as a beverage? Do you hereby pledge yourself not to use intoxicating liquors as a beverage while you hold a license as an Indian trader, and not to permit use by any of your employees?

10. Are you or any of your prospective employees afflicted with active pulmonary tuberculosis?

It will be seen that the applicant answered the foregoing ten searching questions to the satisfaction of the Superintendent of Indian Affairs.

The bond required of a trader in the sum of $10,000.00 requires the applicant to faithfully conform to and observe the laws and regulations made or which shall

be made for the governing of trade and intercourse with the Indian *Tribes*, and in no respect to violate the same. This bond was given to the satisfaction of the Superintendent. It will be noted that this form, which I presume has been used for many years among the Indians in the West on Government Reservations, refers to "governing of trade and intercourse with the Indian *Tribes*." This bond certainly does not fit the situation we have in mind, because the Indians on the land in question are neither a Tribe nor a Nation. However, the applicant has met all the requirements required of an applicant to trade with Indian Tribes or Nations or bands of Indians. It has been more than six months since these papers were filed with the Commissioner of Indian Affairs. Mr. Blair, who is intimately in touch with the Indians on these lands as Superintendent, certainly knows more about the situation there than any person in Washington, and he told the Court that he saw no reason why a Trader's License should not be granted to the defendants; and yet more than six months have elapsed and the Commissioner of Indian Affairs has not yet granted the license applied for. Under these circumstances, I have been compelled to find as a fact that the Commissioner of Indian Affairs has without just or reasonable excuse delayed and arbitrarily refused to act in the matter, irrespective of the fact that the application and all proper papers have been in his hands for more than six months, and that this is an unreasonable length of time required for business of this nature.

▇ I am of the opinion that this Trader's License law was passed for the purpose of requiring white men to secure Traders' Licenses before they do business with the Indians. I have no idea that it was ever thought to require a license from an Indian to do a little trading with his own people. It has been established in this Court and I believe proved in this case, that there are a number of Indians on these lands now trading with the Indians and the public and have been doing so for a number of years without a license. To bolster my opinion on this question I cite Section 264, 25 U.S. C.A., which reads in part as follows: "Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale,"

etc. I think it can be reasonably inferred that since Congress will not confiscate the goods of a full blooded Indian who trades without a license, this means that such an Indian does not have to have a license. I have found that these two defendants are full blooded Indians, and I made this finding some two weeks ago. In the meantime, a jury trial was held before me in another case on the question of whether or not these defendants were full blooded Indians. After hearing the case for two or three days and the argument of counsel, the jury went out and returned a verdict within ten minutes, finding that the defendants were full blooded Indians.

▇ Plaintiff's counsel has asked me to find that the United States of America holds title to the Cherokee Indian Reservation in North Carolina in trust for the Eastern Band of Cherokee Indians, and I have so found, striking out the word "Reservation" and inserting in lieu thereof the word "lands". It is a matter of public knowledge that sometime around 1920 and subsequent thereto, the Indians living on these lands became anxious for the lands to be divided among themselves in severalty. I believe the Indian Council recommended that this be done. After conferring with the Commissioner of Indian Affairs, it seemed that the Commissioner of Indian Affairs agreed that his office would undertake the division of this land in severalty among the Indians, but before that could be done, the Eastern Band of Cherokee Indians, the North Carolina corporate name of this band, should deed the land to the United States for the sole purpose of having it divided in severalty among the Indians. Pursuant to this agreement, Congress passed a law in 1924 looking toward a division of the lands in severalty as agreed upon, and exempting the lands while so being divided from all taxation, county and state. Pursuant to these arrangements and the Act of Congress, a Mr. Baker was sent down to the Indian lands for the purpose of ascertaining how many Indians would be entitled to share in the division of the land. I understand he spent three or four years in an effort to accomplish this task. He held that every person having as much as 1/128th of Indian blood in him or her should be entitled to share in the division of the lands. He accordingly found that there were 3,170 Indians of the full blood, half blood, quarter blood, 3/5th blood, and 1/128th blood, who were entitled to share in the division of the

land. It has been stated in open Court by a member of the Indian Council, I believe, that there are not more than four or five hundred full blooded Indians on this land. So, when the Baker roll was finished and sent to Washington, the Indian Council made serious objection to the roll because it included so many persons with so little Indian blood in them. The Council protested to the Commissioner of Indian Affairs, and finally the Baker roll was laid aside and nothing further seemed to be contemplated toward the division of the lands in severalty. Whereupon, Congress made a law repealing the provision in the Act of 1924 providing for the winding up of these lands in severalty. And so, we are right now back where we were twenty, thirty, forty, or fifty years ago with reference to the ownership and the title of the lands. True, the naked title still is in the government, but the land does not belong to the government and never did belong to the government, and the purpose for which the deed was made to the government by the Eastern Band of Cherokee Indians having been fulfilled or failed, the Indians as a matter of law own the land as they always have owned it.

For the foregoing reasons the Court is constrained to hold and does hold that the complainant is not entitled to an injunction restraining the defendants from transacting business in their own store situated on the Indian lands.